The second case for argument is Hamada v. Laborforce. Ms. Bandini. Good morning, your honors. May it please the court, my name is Laura Bandini. I represent Appellant Angie Cowan Hamada, Regional Director of Region 13 of the National Labor Relations Board. The employees freely chose their union, and it has represented them since the 1950s. In every step of this case, Laborforce knowingly violated its employees' rights and systematically weakened their union. Laborforce engaged in serial unfair labor practices consisting of repeated unlawful withdrawals of recognition, refusals to bargain, and egregious unilateral changes. It is a bedrock principle of labor law, dating back to at least the Supreme Court's 1944 Mito Photo Supply Decision, that granting unilateral wage increases to induce employees to leave their union is just as damaging to their rights as an employer threatening or denominating employees. And so it was here. Let me start with Laborforce's withdrawal of union recognition as to the parts department. For over nine months, employee Joe Lohman tried to collect disaffection petition signatures to oust the union. He testified in the ALJ hearing that during that time, he tried to get employees from both the parts and the service departments to sign the petition. But in the end, none of the 51 service department employees would sign. He ended up with just 23.1% of the unit signing, far short of the 50% plus one needed to demonstrate loss of support. The employer accepted the petition and immediately announced that it would refuse to recognize the union as to the parts department employees and would make unilateral changes. But the employer knew the petition was legally insufficient. Two weeks after receiving it, counsel for the employer went to the NLRB seeking a post hoc blessing for its actions. It filed a unit clarification petition admitting that the current bargain unit consisted of, quote, all parts and service department employees and asking that the director exclude the service department from the unit. The regional director denied that petition, but three weeks later, the employer began making unlawful unilateral changes anyway, and the board later affirmed the regional director's determination. As to all of the director's allegations against labor force, the director is likely to succeed in proving the initial withdrawal was unlawful. The district court explicitly stated that it was refusing to decide whether the first petition was appropriate, but as the ALJ concluded, it was not. In addition to the board's rejection of the UC petition, there's extensive evidence here, such as the party's long bargaining history, the successive bargaining agreements defining bargaining unit in the singular, and setting forth wages for both parts and service department employees. Both parts and service department employees voted to ratify the collective bargaining agreement, and labor force submitted dues in a single check to the union. It is uncontested that after receiving the petition, labor force disregarded the terms of the collective bargaining agreement, failed to negotiate with the union, and paid the parts department employees higher wages, gave them less expensive healthcare, and gave them the opportunity to participate in a different 401k plan, not the union plan with a 3% employer match. These unfair labor practices directly caused the second petition to be tainted. While in this single facility, the service department saw parts department getting these raises and cheaper health insurance for eight months on an ongoing basis, while the service department employees, with their union representation, remained stuck at the same lower wages and benefits. They got the message that they would be better off ousting the union, because then labor force would give them more money, too, and that's what happened. It is therefore unsurprising that when Lohman tried to collect signatures from the entire unit again, he finally got some service department employees to sign up. As for the withdrawal of recognition as to the second petition for the entire unit, the district court misapplied the board's master slack analysis, most significantly because it failed to consider the ongoing nature of the violations, that in every paycheck, employees experience these unlawful unilateral changes. This is supported by board law, and it's not contested that this is the law by labor force. This is what is freshest in the employees' minds when they made that decision to sign the second disaffection petition. Moreover, under labor law, labor force's initial illegal unremitted refusal to bargain creates a legal presumption that any subsequent showing of disaffection is tainted. These conclusions are bolstered by the ALJ's well-reasoned determination. Labor force argues that McKinney's articulation of the- You aren't addressing the district court's principal ground decision, which is the lack of irreparable injury. You might want to address the ground on which your client lost. Sure. I believe we lost on all four prongs, unfortunately, but as to irreparable harm, irreparable harm in this case is shown by actual statistical evidence and an inference of harm. Let me begin by the actual statistical evidence in this case. As I just went through, Lohman testified that he tried to get the entire unit both times to sign the petition. The first time, it was 23%. Following the unfair labor practices and the unilateral changes, it was 51.4%. That is unequivocal showing of loss of support. ... how the employees are being harmed by being in the same condition they've been in for the last three years while waiting for the decision of the National Labor Relations Board. They are harmed because they are, they have lost the ability of their union to represent them in matters. So their grievances are- That sounds like an argument that the employees are irreparably harmed in every case where the regional director brings a 10-J proceeding. And I don't think that's consistent with what the Supreme Court said in Starbucks, which is that the standard approach, injunctive relief applies in labor law cases. Actually, so this court has long applied an inference of harm and McKinney doesn't change- He's said a lot of things before Starbucks, but you need to address Starbucks. Thank you, Your Honor. I would be happy to. In Starbucks, they said that there needs to be a clear showing of irreparable harm of the need for injunctive relief. However, that is not a new standard. The clear showing language came from the Supreme Court's decision in winter. And what McKinney says is that it rejected the standard that had been applied in other circuits, but it explicitly cited to blow Dorn this case's precedent as one that correctly applied the correct standard the entire time. But what about Ms. Mandini? I mean, the Supreme Court has emphasized that this is an extraordinary measure, a preliminary injunction. And it seems to me that the harm you've identified, which is undermining the union's connections with this employees, is simply the mine run harm in any NLRB labor dispute case. Right. So what facts in this case make the irreparable harm sort of extraordinary to the point that a PI is warranted? Well, as this as this court has long recognized, which is not disturbed by McKinney because the clear showing had always been there. And in fact, after winter, Harrell was decided, which implied these inferences of harm from an 885 violation that when an employee is denied their their union representation, it causes Section 7 rights that's irreparable. They don't. And especially here, the union needs to rebuild support ahead of new contract bargaining in 2027. So that's coming up without being able to fortify support and get ready for bargaining. It will not it will not be beneficial for the employees. And given the significant unilateral changes, the union here, if this keeps going on, is unlikely to be able to come back from it, because what the employer is doing is dominating these working conditions to the point where employees will feel like a union is ineffective and cannot represent their interests. And they voted and they've had this union since the 1950s. And absent these tainted and unlawful acts by the employer, they would still be represented by this union. The first petition, you cannot decertify a union based on 23 percent of the unit. Back to what seems to me the basic problem in your case, which is what you're saying about this case could be said in every single case in which the board files a 10-J action. And if it's true in every single 10-J case, then how is it extraordinary in any way? This case is not one unfair labor practice. This case is not the initial petition where the the employer ceased recognizing the union as a part of the unit. After that, they made a series of intentional unfair labor practices that they went to the board and asked, are we in a position to be able to make? And the board said, no, that is not the proper bargaining unit. It disregarded the board's the board's U.C. petition ruling, did them anyway. That went on for an extended period of time and then it accepted this tainted petition. And now the entire plant has lost its union. I just wanted to go back to McKinney again, just kind of quickly to make sure that I had stated that in a way that for some reason, why are you referring to Starbucks as McKinney? Oh, I'm sorry. That is how we discover the name of the regional director. It's a good idea to refer to cases by the private party. It is. I apologize. The tax cases would be called commissioner. OK, Starbucks, then apologies, Your Honor. I just wanted to make sure that I had stated that. I just wanted to highlight the point that McKinney in the the clear showing standard, that was not a new standard. I know labor force says we have to disregard all of these decades of precedent that's under 10, including the inference of harm, which we've had in this is in this court. And that is actually not consistent with McKinney. McKinney is quoting. It's hard to change habits, isn't it? Well, there's no need to call it Starbucks. Oh, I'm so sorry, Your Honor. Twice. I'm sorry, Your Honor. Starbucks. But Starbucks does not change that. Starbucks used the same phrase. The clear showing came from winter and winter as as Starbucks itself, in the opinion acknowledged, had been using the winter standard. So therefore, it follows that the clear showing standard is not new in this circuit. This is one that this court has been applying, including the the inferences. And in fact, Harrell, which five came out five years after winter, applied the inferences of harm, which would be inappropriate in this case because it is the same type of 85 case which involves egregious unilateral changes and a refusal to recognize the union. So therefore, the Seventh Circuit's precedents are fully consistent with McKinney. The Trinity health care case from the Sixth Circuit is therefore distinguishable. That court, McKinney expressly rejected the Sixth Circuit standard. Sixth Circuit standard is conflicting with winter. That's the opposite of what is happening in this case. I also wanted to speak about delay in terms of irreparable harm. McKinney recognized that sorry, Starbucks recognized that delay is inherent in the administrative process. Apologies again, Your Honor. Moreover, delay in and of itself is not a litmus test. It only matters if irreparable harm has already occurred and the parties cannot be returned to the status quo. That's not the case here. Here, for example, the second petition only got 51.4 percent, even after all of those unilateral changes, showing that there is still support in the unit for the union. This status quo, it can be restored and in time for bargaining for the next successor contract. Also, the delay in this case was not excessive. The delay is measured from the date of the complaint, and it was less than seven months from the initial complaint from the most recent complaint amendment at four point five months. As the Second Circuit in in parking systems and poor says, five point five months was not undue delay, since as a practical matter, delays of this length are not uncommon, setting two cases with delays of seven months, one year, two cases of 18 months that were not excessive. Indeed, in this court's blowdorn decision, the court granted 10-J relief where, quote, more than two years have already passed since the employer refused to recognize and bargain with the union. Indeed, as the Second Circuit acknowledged, it can take several months for the director to get approval from the general counsel on the board to seek 10-J relief. And with that, I'd like to reserve the rest of my time. Thank you, counsel. Director. May it please the court, James Eckhart for the defendant respondents. With me at council table is Don Vogel, my law partner. Almost two years ago, a majority of the parts and service employees told Labor Force they don't want the union. Employees have a fundamental right not to be represented by a union. That choice is protected by the National Labor Relations Act. The district court properly rejected the director's request to invalidate that choice through the extraordinary remedy of a section 10 J injunction. First, the district court did not clearly err in finding the director failed to establish irreparable harm, imminent and irreparable harm. The district court correctly concluded that the director's delay in seeking injunctive relief weighed against any showing of irreparable harm and the director likewise failed to do actual evidence of imminent irreparable harm. Second, the district court also properly concluded the director was not likely to succeed on the merits because the director failed to establish that the second disaffection petition was tainted by anything Labor Force did. There is no allegation, let alone any evidence that Labor Force participated in the decertification efforts. It is undisputed that Joe Lohmann, the union steward spearheaded. Because let's be clear about what happened here, right? The district court did not actually address the definition of bargaining in a correct, in her opinion, in the singular, in the collective bargaining agreement, correct? Correct, Your Honor.  And in fact, you filed this petition to clarify, um, because you wanted the CBA to be split, correct? I disagree with that characterization. And I'd like to address a few of those points, um, if I may. So the district court, it is true, did not address the first merits dispute about whether there was. Isn't that where this whole thing starts with the definition of the bargaining unit? From then on, it goes south for the union, right? So that, that is an important issue, but the critical point about the district court's order is that the district court assumed the director was correct. And the director's theory on that issue. Do you agree that the district court, I didn't really see a defense in your brief of the notion that the district court lacked jurisdiction to resolve that bargaining unit issue. Do you agree that that was an error by the district court? We agree that was a mistake. It was an error, but it's not reversible error because ultimately the district court assumed that there was a single bargaining unit, and then it went on to determine whether the second disaffection petition was tainted, uh, given the alleged unfair labor practice. Uh, allegations. And so even though the district court. Arguably erred in not reaching that threshold issue. If this court wants to reach it, that's an independent basis to affirm the district court's, uh, denial of the injunction, but ultimately this court doesn't need to get into the merits at all because, uh, the, uh, district court ultimately, uh, held that the director failed to establish irreparable harm, and that was not a clearly erroneous finding by the talk about irreparable harm, because I understand. Well, I've seen, I actually haven't seen any wage rates in the record. Perhaps you can direct me to this. Um, I know in the ALJ decision, there's reference to a blank letter, but I've seen it in the briefs that for the parts department wages were increased. Where is that in the record? Or is it in the record? So I think the only thing the record shows, and this is the testimony by Josh before the, uh, the administrative law judge, and I'm trying to find the, um, site for you, but I looked at what the ALJ cited for the alleged wage rate increases and it did not help me. Okay. Yeah. Um, so I think the, the administrative law judge cited the testimony of Greg Castanero who testified that his wage rate changed from quite significant. And that's one person that's incorrect. Your honor. I think he testified mid to high thirties to 48, but it's important to understand. I believe that the, uh, new wage rate of 48 point, um, and then 25 cents included the reallocation of the 401k, uh, payment that had been going to the union for a 401k once they're once the, um, labor force withdrew recognition, it gave the employees the choice to either getting a little off topic about what I wanted to discuss, which is the difference between harm to the unionization process. Um, you know, which comes up in the, the second circuit decision and parking system versus harm to the employees. Um, there are two different things, right? And the NLRA protects harm. It protects the collective bargaining process. No. So that's where we should be focusing our attention on. I think they're both valid considerations and we don't think, um, either consideration should be excluded. The problem for the director is that they should have moved for a 10 J injunction with respect to the, when do you think they should have moved? Because I think this was yet another error in the district court's order is that she's saying only unfair labor practice filed by the union, the board didn't, um, there was no, um, injunction sought by the director. So she's tying those two events that, that the charge and the lack of filing an injunction, but that's not correct. The statute talks about that. The time, the delay to the complaint filed by the board, correct. So that was yet another error here. I disagree that that was an error in the very first initial charge filed by the union. The union specifically asked the board to seek injunctive relief under section 10 J. So that's at ECF number one dash one. Can't make demands of the board. The board has its own processes. Well, that puts the board on notice. And then your honor is correct that under the statute, the, um, ability to seek injunctive relief under 10 J is tied to when a complaint is filed by the director, but the director's in complete control of when a complaint is filed and it was not an abuse of discretion or clear air by the district court to find the director should have sought injunctive relief sooner than it did the director in its, uh, opening brief, I believe argues that this case was complicated and that needed time to investigate, but there's no detail about what was, uh, what the director needed to investigate for 18 months before seeking injunctive relief. Uh, or, or 11 months before filing the complaint. And that's, that's a concern that a private litigant, uh, would have to cry private litigant that seeks injunctive relief needs time to investigate the claims before going to federal court for an injunction. But the, um, the district court did not air and concluding that the director waited too long and that at this point, so the delay at this point is relevant for two reasons. First, as the district court correctly concluded, it just belies, uh, an allegation that time is of the essence or that there's an imminent irreparable harm that needs to be inverted via averted via an injunction. But the second point is in your opinion, when should the board have filed for an injunction, a 10 J injunction on this record, in this timeline with multiple charges being filed, you know, consolidation that takes time investigation, abandoned, amended, um, when, when, when, when should the board have filed? So, so it should have been before the first withdrawal recognition was effective on September 30th. But to, to make a broader point, we're not asking this court to adopt a bright line, uh, rule about how quickly the director has to seek injunctive relief, ultimately that, uh, discretion rests with the district court to determine whether delay or under other factors undermine a showing of irreparable harm, but, so what do you do with the second circuits cases cited in parking systems, talking about five, six months, not being enough, not supporting delay. What do you do with all those, all those cases? Cause one of your main cases that you rely on, um, I think it's Southern bakeries, like the union was, I think, decertified for two years before the, the board, um, filed a complaint, which that does seem like delay, but that's quite not the case here. So ultimately I think there may be circumstances in which the director can explain why it needed six months before it sought injunctive relief. It has not sought to do that here. It has not sought to explain why it needed 18 months to seek injunctive relief. And ultimately this court is reviewing the district courts, irreparable harm finding for clear air. And there's just been no showing that the district court clearly erred in its assessment of irreparable harm here. And I can point this court to, uh, two cases from the seven, 18 months. I want to know how you're counting that. Well, 18. So 18 about woman's petition and the first desert, uh, withdrawal of recognition to the filing of a complaint. Is that your 18 months? 18 months would be from the initial union charge, which, which explicitly sought section 10 J relief and the filing of the 10 J petition in the district court. Now back to your question about when the director or how quickly the director should have moved with respect to the initial charge, the director did act quickly, but the, um, Mr. Lowman was taken by a union member to the board agent, Helen Gutierrez, who asked Lowman about the basis for the petition. So I should say the extent of the, uh, conversation between the board agent and Mr. Lowman is not in the record, but we know that conversation happened in July of 2023. And so that was very quickly within three weeks, two or three weeks was Mr. Lowman's testimony that he, of him circulating the initial petition that he was taken to meet with the board agent. And so presumably at that point, the board, the director had the information that needed about the circumstances surrounding the initial petition. If the director thought that the initial petition was subject to, uh, uh, attack or invalidation, then at that point, the director could have sought section 10 J injunctive relief before labor forces withdrawal was ultimately effective, which it was not set to go into effect until two or three months later at the end of September. Can I ask you a question about the, um, how we factor in the direct effect on harm to employees or lack thereof. We've been talking about the effect on the union per se, but when it comes to the harm to employees or lack thereof, what factor in the PI factors, where does that play in and how does that work? Um, I, you know, I'd be interested in the NLRB's view on that as well. Yeah, it could be in several of the factors, I think in irreparable harm or the balance of harms that, that could be a relevant consideration. In the public interest factor, that could also be a potentially relevant consideration because generally, uh, courts will look to the potential impact on third parties. Um, and so I think in any of those factors, that's a relevant consideration. And, um, I don't know if that answers your honors question. Yeah. I w I want to address the, um, director's arguments that the service employees refuse to sign the initial disaffection petition, because I don't think that is supported by the record evidence. There is testimony from Lohman and I admit it is a bit muddled that when he was originally seeking to gather, uh, signatures for the original petition, that there were discussions with both parts and service employees, but he testified in, in the portion of the Lohman's testimony that the board relies on Lohman specifically said, and this is at appendix 104, that when he was collecting signatures for the original petition, there were members on both sides who wanted out. That's a quote again, appendix 104. And so even at the time that Mr. Lohman was collecting signatures for the original petition, this was not a case in which all of the service employees or really anybody had said that they don't want to sign the petition. Mr. Lohman's testimony is that even at that time, there were service employees who wanted out of the union. Now, ultimately we know the initial petition was limited, but they didn't sign the petition. That's undisputed. Correct. Correct. And ultimately the original petition was limited to parts department employees only, but that's entirely consistent with Mr. Lohman's testimony that he believed there was a two D there were two different distinct bargaining units. One composed of parts, one composed of service, and that he focused on gathering signatures for the parts side, because those are the employees that he represented. And that's at app 32, his testimony that he focused on port on the parts department, because those were the employees that he represented as parts union steward. There's additional testimony that supports the fact that even during the original disaffection petition, there were service employees who would have voted against the union. That's at supplemental appendix 45. When Mr. Lohman is discussing his meeting with the board agent, he says, quote, then after the meeting, quote, then I started going to service department employees who I knew wanted out as well and began to collect signatures to remove recognition again.  Thank you. Miss Bandy, anything further? Thank you. Just a couple of quick points first, um, about Joe Lohman's testimony. It's page appendix 104 clearly says that he tried to get, um, signatures from both. However, you just testified that while collecting signatures, you attempted to get parts and service to sign the July 23rd decertification petition. Is that correct? Yes. Yes. There were members on both sides who wanted out. So I'm not going to skip. He believed there were members on both sides who wanted out, but they didn't sign. So he tried, but it didn't work because they didn't want to sign the petition. Um, that's just the facts of the case. Also, um, your honors had asked about harm. Wouldn't this be the same kind of harm in every 10 J case, but labor force is saying that we should have rushed to seek a 10 J petition from the outset, from the first charge. The problem in this case is it's a series of unfair labor practices, each one building on the last, each one denigrating the union to the point where it no longer represented any employees in the plant. So for that reason, the board felt like we had to go in and seek a 10 J injunction here. Also as to delay part of the process, um, is to gather evidence. When a charge is filed, we collect position statements, sometimes affidavits, we speak with witnesses. This is part of due process and, and the parties are fully, um, available to take advantage of that as labor force did before we decide whether there's merit in a case. We are not the, um, general counsel is not, uh, the director is not empowered to seek an injunction until a complaint is issued. So only at that point can a decision be made. And at that point, both the general counsel and the board need to sign off on it. And as the parking systems case, as the second circuit realized that process can quote take several months. That's all your honor. Thank you very much. Before you leave, what is the current status of this proceeding before the board? Um, the, the, uh, the administrative law judge had issued released a decision. What's the current status before the board? It is now briefed before the board and awaiting a decision. Okay. There are no argument is contemplated. No. All right. Okay. Thank you. Thank you. In case of taken under advisement.